## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONCERNED CITIZENS OF ST. JOHN )
389 East 26th Street )
Reserve, LA 70084; )
)
LOUISIANA ENVIRONMENTAL ACTION )
NETWORK )
P.O. Box 66323 )
Baton Rouge, LA 70896; *and* )
)
SIERRA CLUB )                           Civil Action No. 21-3063
2101 Webster Street )
Suite 1300 )
Oakland, CA 94612, )                    **COMPLAINT FOR**
             *Plaintiffs*, )           **DECLARATORY AND**
)                                       **INJUNCTIVE RELIEF**
v. )
)
MICHAEL REGAN, Administrator, )
U.S. Environmental Protection Agency, in his )
official capacity, )
1200 Pennsylvania Avenue NW )
Washington, DC 20460, )
             *Defendant*. )

## INTRODUCTION

1.      This is a suit to compel the Administrator of the United States Environmental

Protection Agency ("EPA") to take actions mandated by the Clean Air Act, 42 U.S.C. §§ 7401–

7671q, to protect public health and the environment from industrial sources of air pollution.

EPA has failed to perform its nondiscretionary duties under section 112(d)(6) and (f)(2) of the

Clean Air Act to review air emission standards for Group I Polymers and Resins and to

promulgate a rule that either revises the standards or determines that no revision is required.

Thus, EPA is in ongoing violation of the Act.  This complaint seeks to compel these overdue

reviews and rulemakings for Group I Polymers and Resins source categories regulated under the

National Emission Standards for Hazardous Air Pollutants ("NESHAP"), 40 C.F.R. Part 63 Subpart U.

2.      While EPA has failed and continues to fail to act, community members suffer the consequences of exposure to toxic air pollution from polymers and resins facilities.  These facilities emit highly hazardous air pollutants, including carcinogens like chloroprene, ethylene oxide, formaldehyde, and 1,3-butadiene.  These hazardous air pollutants contribute to high cancer risk in Louisiana, Texas, and other states.  For example, EPA's data show that residents of St. John the Baptist Parish, Louisiana face the highest cancer risk in the nation from hazardous air pollution, due in great part to a polymers and resins facility.

3.      Due to the Defendant Administrator's failure to regulate and control polymers and resins facilities' emissions, Plaintiffs Concerned Citizens of St. John, Louisiana Environmental Action Network, and Sierra Club (collectively, "Plaintiffs") seek a determination that the Defendant Administrator has violated the Clean Air Act by failing to perform nondiscretionary duties under section 112(d)(6) and (f)(2), and an order to compel the Administrator to take each of these required actions in accordance with an expeditious deadline set by this Court.

## JURISDICTION AND VENUE

4.      This action arises under the Clean Air Act, 42 U.S.C. § 7412(d)(6) and (f)(2).

5.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a)(2), and 28 U.S.C. §§ 1331 and 1361.

6.      This Court may order the Administrator to perform the required acts and duties, issue a declaratory judgment, and grant further relief pursuant to 42 U.S.C. § 7604(a), 28 U.S.C. §§ 2201–2202, and 28 U.S.C. § 1361.

7.     Plaintiffs have a right to bring this action under the Clean Air Act, 42 U.S.C. § 7604(a)(2), 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

8.     By certified letter to the Administrator posted on September 17, 2021, Plaintiffs gave notice of this action as required by 42 U.S.C. § 7604(b)(2) and 40 C.F.R. §§ 54.1–54.3.

9.     As sixty days have passed since this submission, Plaintiffs have satisfied the notice requirements in 42 U.S.C. § 7604(b)(2).

10.     Venue is vested in this Court under 28 U.S.C. § 1391(e) because the Defendant, EPA Administrator Michael Regan (in his official capacity), resides in this district.

## PARTIES

11.     Plaintiff Concerned Citizens of St. John is a nonprofit organization based in St. John the Baptist Parish, Louisiana whose mission is to ensure the health and safety of current and future communities in this region by holding government officials and industry accountable for air pollution.  Concerned Citizens of St. John formed in response to EPA data showing that St. John residents face heightened cancer risk due primarily to chloroprene emissions from a polymers and resins facility located in the parish and owned and operated by Denka Performance Elastomer ("Denka").  The organization educates its members, the broader community, and allies on sources of air pollution in and beyond the parish and organizes efforts to protect the health and safety of communities harmed by toxic air pollution.  For example, Concerned Citizens of St. John has raised public awareness on Denka's chloroprene emissions and demanded that EPA require Denka to reduce its pollution.  The organization is also in a coalition of community and environmental groups that advocates for the health and safety of residents in Death Alley (also known as Cancer Alley), a corridor of chemical, petrochemical, plastics, polymers and resins, and other polluting facilities in Louisiana.

12.     Plaintiff Louisiana Environmental Action Network is a nonprofit corporation based in Louisiana whose purpose is to create and maintain a cleaner and healthier environment for all Louisianans.  The organization works with its members and community groups in the Gulf to develop, implement, protect, and enforce legislative and regulatory environmental safeguards.

13.     Plaintiff Sierra Club is a national nonprofit organization with 67 chapters and over 800,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra Club is committed to reducing toxic air pollution, including chloroprene, ethylene oxide and cumulative air pollution at issue in this case, and its impact on human health and the environment.

14.     As part of their organizations' core missions, Plaintiffs educate their members and communities on the impact of toxic air pollution on human health and the environment.  For example, Plaintiffs educate their members about the health impacts of chloroprene and other toxic air emissions from Denka.  Plaintiffs also advocate locally and nationally to reduce air pollution and strengthen national air toxics emission standards to protect public health from cumulative impacts from industrial air pollution and to ensure all necessary safeguards from specific toxic chemicals like chloroprene and ethylene oxide.  Plaintiffs Louisiana Environmental Action Network and Sierra Club litigate to strengthen national air toxics standards and have recently won cases, cited later in this complaint, that show the need to strengthen the air standards for Group I Polymers and Resins.  Plaintiffs Louisiana Environmental Action Network and Sierra Club have also worked and are actively working to prevent and reduce fires,

4

explosions, and toxic leaks at polymers and resins facilities and other chemical facilities.  *See,*

*e.g.*, *Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018).

15.     Defendant Michael Regan is the Administrator of the EPA.  In that role he is

charged with the duty to uphold and fulfill the Clean Air Act and to take required regulatory

actions according to the schedules established therein.  42 U.S.C. § 7601.

## LEGAL FRAMEWORK

16.     The Clean Air Act's purpose is "to protect and enhance the quality of the Nation's

air resources so as to promote the public health and welfare and the productive capacity of its

population."  *Id.* § 7401(b)(1).  A "primary goal" of the Act is "pollution prevention."  *Id.*

§ 7401(c).  Congress enacted the Clean Air Act in part because "the growth in the amount and

complexity of air pollution brought about by urbanization, industrial development, and the

increasing use of motor vehicles, has resulted in mounting dangers to the public health and

welfare."  *Id.* § 7401(a)(2).

17.     In furtherance of the Act's purpose, section 112 requires EPA regulate air

emissions of "hazardous" and other harmful air pollutants from a list of industrial source

categories.  *Id.* § 7412(d).  "Hazardous air pollutants" include pollutants listed by Congress in the

1990 Clean Air Act Amendments, *id.* § 7412(b)(1), and any other compound that is "known to

cause or [that] may reasonably be anticipated to cause adverse effects to human health or adverse

environmental effects," *id.* § 7412(b)(3)(B).

18.     By deadlines provided in the Act, EPA must promulgate emission standards for

each listed source category that emits hazardous air pollutants.  *Id.* § 7412(d).

19.     Emission standards must protect public health and the environment.  *Id.*

§ 7412(d), (f).

20.     Emission standards may differ depending on whether a source category is a "major source" or an "area source."  *Id.* § 7412(a)(1)–(2) (defining major source and area source).  A "major source" is a source that "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  *Id.* § 7412(a)(1).  Emission standards for major sources, referred to as "maximum achievable control technology" standards, must require "the maximum degree of reduction in emissions of . . . hazardous air pollutants . . . [that] is achievable . . . ."  *Id.* § 7412(d)(2).  The standards must be at least as stringent as the "floor," defined as the average emission limitation that the relevant best controlled or best-performing sources have "achieved."  *Id.* § 7412(d)(3).

21.     An "area source" is a source of hazardous air pollutants that is not a "major source."  *Id.* § 7412(a)(2).  For area sources, EPA may set emission standards that require the use of "maximum achievable control technology" or "generally available control technolog[y]."  *Id.* § 7412(d)(5).

22.     EPA must periodically review and revise emission standards according to deadlines in the Act.

23.     In particular, under section 112(d)(6), "[t]he Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years."  *Id.* § 7412(d)(6).  In this rulemaking, EPA must make all revisions "necessary" to bring standards into full compliance with the Clean Air Act, such as: (1) setting limits on uncontrolled hazardous air pollutant emissions, *see Louisiana Envtl. Action Network v. EPA*, 955 F.3d 1088, 1096 (D.C. Cir. 2020); and (2) removing illegal exemptions and loopholes for emissions during

startup, shutdown, and malfunction periods, *see, e.g.*, *Sierra Club v. EPA*, 551 F.3d 1019, 1028

(D.C. Cir. 2008); *Nat. Res. Def. Council v. EPA*, 749 F.3d 1055, 1062–64 (D.C. Cir. 2014).

Thus, every eight years, the Administrator must review emission standards and promulgate either

a revision of the standards or a determination that no revision is "necessary."  42 U.S.C.

§ 7412(d)(6).

24.     In addition, section 112(f) of the Act requires further action "to protect health and

[the] environment."  *Id.* § 7412(f).

25.     The Act directs EPA to submit a report to Congress by 1996 on methods of

calculating residual risk, "the risk to public health remaining, or likely to remain" after the

application of section 112(d) standards.  The report must also address the public health

significance of health risks, the actual health effects of hazardous air pollutant emissions on

communities near regulated sources, and recommended legislation.  *Id.* § 7412(f)(1).

26.     EPA submitted this report in 1999.  *See* EPA, *Residual Risk Report to Congress*,

EPA-453/R-99-001 (Mar. 1999), https://www.epa.gov/sites/default/files/2013-

08/documents/risk_rep.pdf.

27.     Congress did not act on that report's recommendations.

28.     Congress's inaction triggered the Administrator's duty to review the residual

health and environmental risks and to promulgate either emission standards to address and

reduce these risks or a determination that no such standards are required.  42 U.S.C. § 7412(f)(2).

In particular, the Administrator must promulgate residual risk standards if required "to provide

an ample margin of safety to protect public health . . . or to prevent, taking into consideration

costs, energy, safety, and other relevant factors, an adverse environmental effect."  *Id.*  Section

112(f)(2) directs that:

(A)    If Congress does not act on any recommendation submitted under paragraph (1), *the Administrator shall, within 8 years after promulgation* of standards for each category or subcategory of sources pursuant to [section 112(d)], promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section . . . or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect.   Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) . . . . If standards promulgated pursuant to [section 112(d)] and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, *the Administrator shall promulgate standards under this subsection for such source category.*

. . .

(C)    The Administrator *shall determine whether or not to promulgate such standards and*, if the Administrator decides to promulgate such standards, *shall promulgate the standards 8 years after promulgation* of the [section 112(d) standards] for each source category or subcategory concerned.

*Id.* (emphasis added).

29.    Thus, within eight years of promulgating emission standards under section 112(d), EPA must promulgate either residual risk standards to protect public health and the environment or a determination that such standards are not required.  *Id.* § 7412(f)(2)(A).

30.    Section 112(d) and 112(f) standards become effective "upon promulgation."  *Id.* § 7412(d)(10), (f)(3); *see also id.* § 7412(i) (setting compliance schedule for section 112(d) standards); *id.* § 7412(f)(4) (setting compliance schedule for section 112(f) standards).

**FACTS**

**Overdue EPA Nondiscretionary Duties Under 42 U.S.C. § 7412(d)(6)**

31.     Group I Polymers and Resins is a group of eight source categories: Neoprene

Production, Butyl Rubber Production, Epichlorohydrin Elastomers Production, Ethylene

Propylene Rubber Production, Nitrile Butadiene Rubber Production, Polybutadiene Rubber

Production, Polysulfide Rubber Production, and Styrene Butadiene Rubber and Latex

Production.

32.     Facilities in the Group I Polymers and Resins categories emit at least 19

hazardous air pollutants, including chloroprene, ethylene oxide, 1,3-butadiene, and

formaldehyde.  40 C.F.R. Pt. 63, Subpt. U, Tbl. 5.

33.     EPA first promulgated emission standards for Group I Polymers and Resins on

September 5, 1996.  *See* EPA, National Emission Standards for Hazardous Air Pollutant

Emissions: Group I Polymers and Resins, 61 Fed. Reg. 46,906 (Sept. 5, 1996) (codified at 40

C.F.R. Pt. 63, Subpt. U, §§ 63.480–507 & Tbls. 1–9) ("1996 Action").

34.     As a result of the 1996 Action, the Administrator was required to "review, and

revise as necessary" the standards for Group I Polymers and Resins source categories under

section 112(d)(6) within eight years, *i.e.*, by September 5, 2004.

35.     On December 16, 2008, EPA conducted a section 112(d)(6) review and readopted

standards for four Group I Polymers and Resins source categories: Neoprene Production,

Polysulfide Rubber Production, Ethylene Propylene Rubber Production, and Butyl Rubber

Production.  EPA, National Emission Standards for Hazardous Air Pollutant Emissions: Group I

Polymers and Resins, 73 Fed. Reg. 76,220 (Dec. 16, 2008) ("2008 Action").

36.     As a result of the 2008 Action, the Administrator was required to "review, and revise as necessary" the standards for these four Group I Polymers and Resins source categories (*see* ¶ 35) under section 112(d)(6) within eight years, *i.e.*, by December 16, 2016.

37.     The Administrator did not conduct a review and promulgate revisions or a determination that no revisions were necessary under section 112(d) for these four source categories (*see* ¶ 35) between December 16, 2008, and December 16, 2016.

38.     The Administrator has not completed a section 112(d)(6) review of these four source categories (*see* ¶ 35) since 2008.

39.     The Administrator has not promulgated necessary revisions of these four source categories (*see* ¶ 35) under section 112(d)(6) since 2008.

40.     The Administrator has not promulgated any determination that no revisions are necessary for these four source categories (*see* ¶ 35) under section 112(d)(6) since 2008.

41.     Therefore, the Administrator has violated and is in ongoing violation of his statutory duty under section 112(d)(6) for the Neoprene Production, Polysulfide Rubber Production, Ethylene Propylene Rubber Production, and Butyl Rubber Production source categories.

42.     On April 21, 2011, the Administrator conducted a section 112(d)(6) review of and readopted standards for the other four Group I Polymers and Resins source categories: Epichlorohydrin Elastomers Production, Polybutadiene Rubber Production, Styrene Butadiene Rubber and Latex Production, and Nitrile Butadiene Rubber Production.  EPA, National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins, 76 Fed. Reg. 22,566 (Apr. 21, 2011) ("2011 Action").

43.    As a result of the 2011 Action, the Administrator was required to "review, and revise as necessary" the standards for Epichlorohydrin Elastomers Production, Polybutadiene Rubber Production, Styrene Butadiene Rubber and Latex Production, and Nitrile Butadiene Rubber Production source categories under section 112(d)(6) within eight years, *i.e.*, by April 21, 2019.

44.    The Administrator did not conduct a review and promulgate revisions or a determination that no revisions were necessary under section 112(d) for these four source categories (*see* ¶ 42) between April 21, 2011, and April 21, 2019.

45.    The Administrator has not completed a section 112(d)(6) review for these four source categories (*see* ¶ 42) since 2011.

46.    The Administrator has not promulgated necessary revisions under section 112(d)(6) for these four source categories (*see* ¶ 42) since 2011.

47.    The Administrator has not promulgated any determination that no revisions are necessary under section 112(d)(6) for these four source categories (*see* ¶ 42) since 2011.

48.    Therefore, the Administrator has violated and is in ongoing violation of his statutory duty under section 112(d)(6) for the Epichlorohydrin Elastomers Production, Polybutadiene Rubber Production, Styrene Butadiene Rubber and Latex Production, and Nitrile Butadiene Rubber Production source categories.

49.    The table below lists EPA's overdue nondiscretionary duties under section 112(d)(6) to complete air toxics rulemakings and promulgate final actions for the following polymers and resins source categories:

| Overdue Rulemaking Duties Under Section 112(d)(6) | | |
|---|---|---|
| **Source Category** | **Last Section 112(d) Review and Rulemaking** | **Overdue Deadline for Final Action** |
| 1.  Butyl Rubber Production | 2008 Action | December 16, 2016 |
| 2.  Ethylene Propylene Rubber Production | 2008 Action | December 16, 2016 |
| 3. | | |
| 4.  Neoprene Production | 2008 Action | December 16, 2016 |
| 5.  Polysulfide Rubber Production | 2008 Action | December 16, 2016 |
| 6.  Nitrile Butadiene Rubber Production | 2011 Action | April 21, 2019 |
| 7.  Polybutadiene Rubber Production | 2011 Action | April 21, 2019 |
| 8.  Styrene Butadiene Rubber and Latex Production | 2011 Action | April 21, 2019 |
| 9.  Epichlorohydrin Elastomers Production | 2011 Action | April 21, 2019 |

### Overdue EPA Nondiscretionary Duties Under 42 U.S.C. § 7412(f)(2)

50.     As a result of the 1996 promulgation of section 112(d) standards for all Group I Polymers and Resins source categories, the Administrator was required to assess the remaining health and environmental risks and to promulgate either residual risk standards or a determination that no such standards are required.  42 U.S.C. § 7412(f)(2).

51.     The Administrator did not complete and still has not completed a section 112(f) review for Neoprene Production.

52.     The Administrator failed to quantify the cancer risk from chloroprene emissions for Neoprene Production under section 112(f)(2) and instead has treated the cancer risk as zero.

53.     The Administrator did not promulgate and still has not promulgated required residual risk standards under section 112(f) for Neoprene Production.

54.     Therefore, the Administrator has violated and is in ongoing violation of his statutory duty under section 112(f)(2) for Neoprene Production.

55.     In the 2011 Action, EPA promulgated new emission standards pursuant to section 112(d)(2) and (3) for previously unregulated emissions from five source categories: (1) front-end process vents in the Butyl Rubber Production and Ethylene Propylene Rubber Production source categories and (2) back-end processes in the Epichlorohydrin Elastomers Production, Nitrile Butadiene Rubber Production, Neoprene Production, and Butyl Rubber Production source categories.  *See* 2011 Action, 76 Fed. Reg. at 22,569, 22,570; Proposed Rule, 75 Fed. Reg. 65,068, 65,125 (proposed Oct. 21, 2010) (setting emission standards under 42 U.S.C. § 7412(d)(2) for previously unregulated emissions).

56.     As a result of the 2011 Action promulgating emission standards under section 112(d)(2) and (3), the Administrator was required to assess the remaining health and environmental risks and promulgate either residual risk standards or a determination that such standards were not required for these five source categories (*see* ¶ 55) within eight years, *i.e.*, by April 21, 2019.  42 U.S.C. § 7412(f)(2).

57.     The Administrator did not conduct such a review or promulgate residual risk standards or a determination that no such standards were required under section 112(f) for these five source categories (*see* ¶ 55) between April 21, 2011, and April 21, 2019.

58.     The Administrator has not completed a section 112(f) review for these five source categories (*see* ¶ 55) since 2011.

59.     The Administrator has not promulgated required residual risk standards under section 112(f) for these five source categories (*see* ¶ 55) since 2011.

60.     The Administrator has not promulgated any determination that no such standards are required under section 112(f) for these five source categories (*see* ¶ 55) since 2011.

61.     Therefore, the Administrator has violated and is in ongoing violation of his statutory duty under section 112(f)(2) for the Neoprene Production, Ethylene Propylene Rubber Production, Epichlorohydrin Elastomers Production, Nitrile Butadiene Rubber Production, and Butyl Rubber Production source categories.

### Health Effects of Air Pollution From Polymers and Resins Facilities

62.     There are about 25 active facilities regulated by the NESHAP for Group I Polymers and Resins according to EPA's Enforcement and Compliance History database.

63.     Exposure to hazardous air pollutants emitted by polymers and resins facilities increases the risk of cancer.

64.     Carcinogens have no safe level of human exposure.

65.     Cancer risk is additive, increasing with exposure to carcinogens.

66.     Prenatal and early childhood exposure to carcinogens and other air pollutants particularly increases an individual's lifetime risk of cancer and other adverse health effects.

67.     Exposure to hazardous air pollutants emitted by Group I Polymers and Resins, such as ethylene oxide and chloroprene, can also increase the likelihood of chronic illness or other long-term damage to the reproductive, developmental, nervous, cardiovascular, hematological, immune, respiratory, renal, and hepatic systems.

68.     People face exposure to hazardous air pollutants via multiple pathways, including inhalation.

69.     Breathing hazardous air pollutants emitted by polymers and resins facilities, such as ethylene oxide and benzene, can cause severe or acute harm, such as respiratory and neurological harm.

70.     In addition, EPA has found that volatile organic compounds emitted by polymers and resins facilities are precursors to the formation of ozone in the ambient air.

71.     Ambient ozone can cause or exacerbate asthma attacks, lung inflammation, reduction of lung function, respiratory symptoms (such as cough, chest pain, and throat and nose irritation), and increase lung permeability.

72.     Both short- and long-term exposure to ozone is associated with increased hospitalizations and deaths from respiratory causes.

73.     As EPA has repeatedly recognized, children are especially vulnerable to the harmful effects of ozone, including asthma.

74.     Asthma-related hospitalizations and deaths are elevated among children, particularly among Black children.

75.     EPA has stated that "Black children are two times as likely to be hospitalized for asthma and are four times as likely to die from asthma as White children."  EPA, *Children's Environmental Health Disparities: Black and African American Children and Asthma* 3, https://www.epa.gov/sites/production/files/2014-05/documents/hd_aa_asthma.pdf (last visited Nov. 18, 2021).

76.     EPA has found that ozone can also damage vegetation including forests, commercial trees, and agricultural crops, and result in damage to ecosystems.

77.     Some communities that are currently out of attainment with EPA's National Ambient Air Quality Standards for ozone due to unhealthy air quality include areas with one or more polymers and resins facilities.

78.     Socioeconomic disparities and related stressors increase vulnerability to carcinogenic and other toxic exposures.

**Ethylene Oxide Emissions**

79.     Ethylene oxide is a highly potent carcinogen emitted by some polymers and resins facilities.

80.     EPA's 2016 Integrated Risk Information System Toxicological Review and determination concluded that ethylene oxide's cancer risk value is thirty times more potent than previously known and elevated ethylene oxide from a probable carcinogen to a known carcinogen.

81.     EPA's most recent National Air Toxics Assessment, based on data from 2014 and released in 2018, showed that many communities face a cancer risk higher than EPA's own benchmark of presumed unacceptable cancer risk (100-in-1 million), in part due to ethylene oxide emissions.

82.     Due to the results of the two national air toxics assessments, EPA announced that it is working to address ethylene oxide pollution.

83.     EPA's website states that it plans to review regulations for facilities that emit ethylene oxide, including the NESHAP rule for Group I Polymers and Resins source categories.

**Chloroprene Emissions**

84.    The Neoprene Production source category emits chloroprene, another carcinogenic hazardous air pollutant.

85.    In a 2010 Integrated Risk Information System Toxicological Review and determination for chloroprene, EPA concluded that chloroprene "is likely to be carcinogenic to humans" and determined that chloroprene levels of $0.002 \ \mu g/m^3$ are attributable to a cancer risk of 1-in-1 million.  .

86.    In 2010, EPA also concluded that chloroprene contributed not only to elevated cancer risk but also to the threat of numerous other adverse health effects, including damage to the nervous, cardiovascular, and hematological systems and dizziness, headache, insomnia, and fatigue.

87.    Previously, EPA assumed that the cancer risk value of chloroprene was zero.  .

88.    The only Neoprene Production facility in the United States, owned and operated by Denka, is sited in St. John the Baptist Parish, Louisiana, a predominantly Black community located in a heavily industrialized area between New Orleans and Baton Rouge long known as Cancer Alley.

89.    EPA's 2014 National Air Toxics Assessment concluded that St. John residents face a cancer risk as high as 1,505-in-1 million—the highest cancer risk in the nation from air pollution—due to toxic air pollutant emissions from nearby facilities including Denka.

90.    EPA attributed 85% (1,279-in-1 million) of the cancer risk from air pollution in a St. John census tract to chloroprene emissions, 12% (187-in-1 million) to ethylene oxide emissions, and 3% (38-in-1 million) to all other pollutants.

91.     Localized data published in a 2021 study "Waiting to Die," coauthored by Concerned Citizens of St. John leaders, confirm that living close to Denka increases the likelihood of chloroprene-linked medical symptoms, including respiratory issues.  Ruhan Nagra et al., *"Waiting to Die,"* 14 ENVIRONMENTAL JUSTICE 14, 23 (Feb. 2021), https://www.liebertpub.com/doi/abs/10.1089/env.2020.0056.

92.     In 2016, EPA found that human exposure to an ambient air concentration of chloroprene of 0.2 $\mu g/m^3$ is associated with a cancer risk of 100-in-1 million, and an ambient concentration of chloroprene of 0.002 $\mu g/m^3$ is associated with a cancer risk of 1-in-1 million.

93.     Denka has continued to emit chloroprene and cause ambient chloroprene concentrations in St. John that are greater than the cancer risk value of 0.002 $\mu g/m^3$, sometimes by a factor of more than ten thousand.

**Failure to Review and Promulgate Stronger Polymers and Resins Standards During Health Emergency**

94.     In 2016, EPA created an Action Plan to address the health emergency in St. John the Baptist Parish resulting from toxic air pollution.  EPA began ambient air monitoring.

95.     EPA has since failed to fulfill its Action Plan or protect St. John residents from toxic air pollution.

96.     In May 2021, Concerned Citizens of St. John submitted a petition to EPA calling for the agency to end the health emergency the community faced from toxic air pollution, including by performing a new rulemaking under Clean Air Act section 112(d)(6) and (f)(2).

97.     In June 2021, EPA Acting Assistant Administrator for the Office of Air and Radiation stated in a letter that EPA would "be considering use of all relevant Clean Air Act authorities available to achieve further emission reductions and health protections for the citizens of St. John the Baptist Parish."

98.     EPA submitted an information collection request to Denka in June 2021 under Clean Air Act section 114, 42 U.S.C. § 7414, requiring submission of information by Denka about its emissions to EPA's air and enforcement offices.  It is unclear when EPA will receive this information or when it will release this information to the public.

99.     In spring 2021, EPA's Office of Inspector General recommended EPA conduct a section 112(d)(6) and (f)(2) residual risk and technology review of the emission standards for certain source categories, including Group I Polymers and Resins, causing or contributing to cancer risk hot spots.

100.    In response to the Office of Inspector General's recommendation, the Office of Air and Radiation stated that it planned to perform a rulemaking for Group I Polymers and Resins for "draft completion" by Quarter 2 of Fiscal Year 2024 and that EPA was evaluating options to reduce health risk.

101.    In August 2021, the Office of Inspector General concluded that its recommendation was unresolved, in part because the Office of Air and Radiation did not commit to conducting a residual risk review for Group I Polymers and Resins and other source categories.

102.    EPA has not committed to assessing health risk or assuring an ample margin of safety to protect public health from Group I Polymers and Resins facilities, nor has it committed to doing so expeditiously.

103.    According to EPA's monitoring data, chloroprene air concentrations remain as high as 23.677 $\mu g/m^3$ in St. John as of September 2021—almost *12,000 times* the ambient concentration cancer risk value of 0.002 $\mu g/m^3$.

## **The Need for Rulemakings to Revise Emission Standards**

104.    Existing Group I Polymers and Resins regulations (40 C.F.R. Pt. 63, Subpt. U) contain incomplete and outdated provisions that EPA would be required to revise and strengthen in the overdue rulemakings.

105.    Strengthening these rules would reduce air pollution.

106.    In the overdue section 112(d)(6) review, EPA would be required to set emission limits on all currently uncontrolled hazardous air pollutant emissions from polymers and resins facilities under binding D.C. Circuit precedent.  *See Louisiana Envtl. Action Network*, 955 F.3d at 1096.

107.    For example, most hazardous air pollutant emissions from Neoprene Production, including chloroprene emissions, are emitted from front-end processes, but EPA does not regulate chloroprene emissions on front-end processes.

108.    The rules also contain an affirmative defense to civil penalties for pollution exceedances during malfunctions.  40 C.F.R. § 63.480(j)(4).

109.    EPA would be required to remove this defense because it exceeds EPA's authority and violates the Clean Air Act citizen suit provision, 42 U.S.C. § 7604(a), according to binding D.C. Circuit precedent, *Nat. Res. Def. Council*, 749 F.3d at 1062–64.

110.    The affirmative defense provision is harmful for communities near polymers and resins facilities that are exposed to spikes in dangerous pollution from uncontrolled releases during malfunctions.  It is particularly dangerous for communities in the hurricane-prone Gulf of Mexico region, including Louisiana and Texas, where facilities' inadequate preparation for natural disasters can trigger malfunctions, toxic leaks, fires, and explosions.

111.    To comply with the Act, EPA would also be required to revise the emission standards in all other ways that are "necessary" to comply with the Act, including to "tak[e] into account developments in practices, processes, and control technologies," 42 U.S.C. § 7412(d)(6), such as fenceline monitoring and any other methods to control leaks and other fugitive emissions of hazardous air pollutants.  For example, in a section 112(d) and (f) review rulemaking for emission standards for a similar source category, petroleum refineries, EPA required fenceline monitoring and corrective action for fugitive emissions.

112.    Revision of the rule's outdated flare standards in 40 C.F.R. § 63.11 (incorporated under 40 C.F.R. § 63.504(c)) would also be "necessary" under section 112(d)(6).

113.    On multiple occasions, EPA has recognized that the general flare standards under 40 C.F.R. § 63.11 are outdated, lead to the operation of flares with poor destruction efficiency, and require revision.

114.    In recent rulemakings for similar chemical and petrochemical source categories, EPA promulgated rules improving flare operational and monitoring requirements.  These show some of the essential revisions EPA would likely find necessary after performing its statutorily required reviews under section 112(d)(6) and (f)(2).

115.    EPA must also consider new "developments" in leak detection and repair and other types of pollution controls that can achieve lower levels of emissions from Group I Polymers and Resins, such as the new leak detection sensor network that some similar facilities are now seeking to use.  EPA would be required to incorporate such developments in the overdue section 112(d)(6) rulemakings.

116.    The new rulemakings must also incorporate new science on the carcinogenicity of chloroprene and other new information that has emerged since EPA rulemakings in 2008 and

2011, including the 2010 Integrated Risk Information System Toxicological Review for
chloroprene, the 2016 Integrated Risk Information System Toxicological Review for ethylene
oxide, and the 2011 and 2014 National Air Toxics Assessments showing high cumulative risks
from polymers and resins and other collocated and nearby sources.

117.    EPA would also need to consider new information and scientific
recommendations in the overdue health risk rulemakings.  For example, in 2009, the National
Academy of Sciences recommended that EPA update its health risk assessment approach to
better account for vulnerability, uncertainty, and cumulative risks and impacts to people exposed
to toxic chemicals.  National Research Council, *Science and Decisions: Advancing Risk
Assessment* (2009), http://www.nap.edu/catalog.php?record_id=12209.

## ALLEGATIONS OF INJURY

118.    Plaintiffs and their members and constituents are and will continue to be harmed
by the Administrator's failures to take the actions required by 42 U.S.C. § 7412(d)(6) and (f)(2)
for Group I Polymers and Resins, 40 C.F.R. Pt. 63, Subpt. U.

119.    Plaintiffs' members live, work, travel, recreate, and engage in other activities near
polymers and resins facilities.  Plaintiffs' members suffer exposure and other harm to their
health, recreational, aesthetic, educational, professional, and other interests by breathing the
hazardous air pollutants emitted by facilities Group I Polymers and Resins source categories.
Exposure to hazardous air pollutants emitted by polymers and resins facilities has adverse health
effects, which may include respiratory, neurological, developmental, and reproductive harm;
damage to bodily organs and the central nervous system; cancer; and other health effects
described above.

120.   Plaintiffs' members are concerned that hazardous air pollutants from polymers and resins facilities are present in the locations where they live, work, travel, recreate, and engage in other activities.  These reasonable concerns about their exposure to pollutants diminish their enjoyment of activities and areas they previously enjoyed or would like to continue to engage in or use, and thereby harm their recreational, aesthetic, educational, professional, and other interests.

121.   Further, polymers and resins facilities emit air pollutants that can damage surrounding wildlife, plants, waters, land, communities, and ecosystems, and thus harm Plaintiffs' members' recreational, aesthetic, educational, professional, and other interests in those wildlife, plants, waters, land, communities, or ecosystems.  As detailed above, the pollution emitted by polymers and resins facilities includes hazardous air pollutants, which contribute to ambient ozone that can harm plant species and result in changes in wildlife habitat.  These changes can lead to wildlife avoidance of certain areas, as well as a reduction in biodiversity or other changes to a local community's ecosystem.  Ecosystem changes make it more difficult for Plaintiffs' members to observe, fish, cultivate, study, research, or write about wildlife, plants, or ecosystems.

122.   Plaintiffs and their members suffer additional harm because they do not have up-to-date information, published findings, or determinations from the Administrator regarding the emission limitations existing facilities have achieved, the current pollution control methods, practices, and technologies that could or are being used to achieve emission reductions, the health and environmental risks that remain under the existing standards, or other information relevant to the need for stronger emission standards.  This information would be provided to Plaintiffs, their members, and other interested members of the public by EPA as a result of the

Administrator's required actions pursuant to section 112(d)(6) and (f)(2).  *See, e.g.*, 42 U.S.C.

§ 7607(d)(3)–(6) (describing notice and informational disclosures required as part of

rulemakings under section 112).

123.    If Plaintiffs and their members had this information, they would use it to work for

stronger health and environmental protections; to educate members, supporters, and the public

pursuant to their organizational missions; and to protect themselves and their families from air

pollutants and affected land, water, and food.  The denial of this information impairs Plaintiffs'

ability to provide information and services to their members that assist them in protecting their

interests, hampers the ability of Plaintiffs and their members to take actions to protect their

health and communities, and diminishes their enjoyment of activities in their daily lives.

124.    Plaintiffs and their members suffer harm because they are denied the opportunity

to submit written comments, data, and documentary information to EPA and to present data,

views, or arguments to EPA and have these considered by EPA and responded to as part of the

overdue section 112(d)(6) and (f)(2) rulemakings.  The Administrator's failures to conduct the

overdue rulemakings have denied Plaintiffs and their members the opportunity to seek greater

health protections and emissions reductions, and to have EPA consider and respond to such

comments in taking the final actions required by section 112(d)(6) and (f)(2).  Deprivation of the

ability to present comments and arguments and have them considered and addressed by EPA

impairs Plaintiffs' and their members' ability to serve and protect their interests and fulfill their

organizational missions.

125.    Plaintiffs and their members suffer harm because the Administrator has not issued

final rules or determinations under section 112(d)(6) and (f)(2) addressing and including all

matters these provisions require, as discussed above.  Any such rule or determination would be

judicially reviewable.  *See id.* § 7607(b).  Deprivation of the right to judicial review harms the ability of Plaintiffs and their members to protect their interests and fulfill their organizational missions.

126.    The Administrator's failures to take actions required by section 112(d)(6) and (f)(2) deprive Plaintiffs' members of the cleaner air that would result from those actions. Consequently, Defendant prolongs and increases Plaintiffs' members' exposure to hazardous air pollutants that can cause health, recreational, aesthetic, and other injuries as described above. Defendants' failures to take these actions also prolongs and increases the air pollutant exposure of wildlife, plant, water, land, local communities, and ecosystems, resulting in harm to Plaintiffs' members' interests, as described above.  Emission reductions required under section 112(d)(6) and (f)(2), would reduce these exposures, and would reduce the related health, recreational, aesthetic, and other harms suffered by Plaintiffs' members.

127.    By not taking the actions required by section 112(d)(6) and (f)(2), the Administrator deprives Plaintiffs and their members of information, published findings, and determinations, as described above.  *See, e.g.*, *id.* § 7607(d)(3)–(6).  In addition, the Administrator's failures to take the actions required by section 112(d)(6) and (f)(2) deprive Plaintiffs and their members of the opportunity to receive judicial review of the lawfulness of the final EPA actions.  *See id.* § 7607(b).  These failures make it more difficult for Plaintiffs and their members to seek health and environmental protections from air pollutants; to shield themselves, their families, and other community members from exposure to such pollutants; to protect their health, recreational, aesthetic, and other interests; and to be able to enjoy activities in their daily life without concerns about exposure to air pollutants.  These failures also impair Plaintiffs' ability to provide educational services to their members concerning air pollution from

polymers and resins facilities and hinder Plaintiffs' ability to provide services and take actions

vital to fulfilling their public health missions.

128.     For all of the foregoing reasons, the failures complained of herein cause Plaintiffs

and their members and constituents injuries for which they have no adequate remedy at law.

Granting the requested relief would redress these injuries.

**CLAIMS FOR RELIEF**

129.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth

fully herein.

**<u>Violations of Section 112(d)(6) of the Clean Air Act</u>**

130.     Each of the Administrator's ongoing failures to review the National Emission

Standards for Hazardous Air Pollutants for Group I Polymers and Resins source categories listed

in the table above (¶ 49) and to promulgate either revised emission standards or a determination

not to revise these standards in accordance with 42 U.S.C. § 7412(d)(6), constitutes a "failure of

the Administrator to perform any act or duty under this chapter which is not discretionary"

within the meaning of section 304(a)(2) of the Clean Air Act for each such source category.

131.     Each day the Administrator fails to take these legally required actions, Defendant

commits new, additional, and ongoing violations of its duties under section 112(d)(6).

**<u>Violations of Section 112(f)(2) of the Clean Air Act</u>**

132.     Each of the Administrator's ongoing failures to review the residual health and

environmental risk and to promulgate either section 112(f)(2) residual risk standards or a final

determination not to promulgate such standards for the Group I Polymers and Resins source

categories listed in paragraph 61 above constitutes a "failure of the Administrator to perform any

act or duty under this chapter which is not discretionary" within the meaning of section 304(a)(2)

26

of the Clean Air Act for each such source category.

133.   Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of its duties under section 112(f)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, for the Group I Polymers and Resins source categories regulated by the National Emission Standards for Hazardous Air Pollutants, 40 C.F.R. Part 63, Subpart U, that the Court:

(1)   Declare that each of the Defendant Administrator's failures to review the emission standards and to promulgate either revised emission standards or a final determination that such revision is not necessary under section 112(d)(6) for all Group I Polymers and Resins source categories within eight years, constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of section 304(a)(2);

(2)   Order the Defendant Administrator to review the emission standards and to promulgate either revised emission standards or a final determination that such revision is not necessary under section 112(d)(6) for all Group I Polymers and Resins source categories, in accordance with an expeditious deadline specified by this Court;

(3)   Declare that each of the Defendant Administrator's failures to review health and environmental risk remaining from standards promulgated under section 112(d) and to promulgate either residual risk standards or a final determination that such standards are not required under section 112(f)(2) for Group I Polymers and Resins source categories Neoprene Production, Ethylene Propylene Rubber Production, Epichlorohydrin Elastomers Production, Nitrile Butadiene Rubber Production, and Butyl Rubber Production constitutes a "failure of the

Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of section 304(a)(2);

(4)     Order the Defendant Administrator to review the remaining health and environmental risk and to promulgate either residual risk standards or a final determination that no such standards are required under section 112(f)(2) for Group I Polymers and Resins source categories Neoprene Production, Ethylene Propylene Rubber Production, Epichlorohydrin Elastomers Production, Nitrile Butadiene Rubber Production, and Butyl Rubber Production source categories, in accordance with an expeditious deadline specified by this Court;

WHEREFORE, Plaintiffs respectfully request, for each of the above-listed obligations and rulemakings at issue in this case, that the Court retain jurisdiction to ensure compliance with this Court's decree, award Plaintiffs the costs of this action, including attorney's fees, and grant such other relief as the Court deems just and proper.

DATED:  November 18, 2021

Respectfully Submitted,

*/s/ Emma Cheuse*
Emma Cheuse
(D.C. Bar No. 488201)
Deena Tumeh
(D.C. Bar No. 1741543)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
dtumeh@earthjustice.org
echeuse@earthustice.org

*Counsel for Plaintiffs Concerned Citizens of St. John, Louisiana Environmental Action Network, and Sierra Club*